JONES, Judge.
This is a suit for damages for personal injuries on the part of the petitioner, Beatrice Lacour, and for reimbursement of medical expenses- on the part of her husband, Nathaniel A. Lacour.-
The allegations of the petition show Beatrice Lacour was a fare-paying passenger on a bus being operated by the Continental Southern Lines, Inc. in the Parish of Pointe Coupee and that while she was on said bus she received painful and serious injuries on the 24th day of November, 1957, at about 6:45 o’clock p. m., when the said bus owned by the above-named defendant and being driven by its driver, one Michael J. Mancuso, was involved in an accident with a Ford automobile driven by one William Vercher, Jr. It is alleged that William Vercher, Jr. was a minor who resided with his parents at their residence in the Parish of Pointe Coupee and, accordingly, his father, William Vercher, Sr., was made a party to the suit individually and as administrator of the estate of his minor child. It is also alleged that at the time the accident occurred the bus was proceeding south on Louisiana Highway One in the immediate vicinity of Labarre, a small village in the Parish of Pointe Coupee, and that said bus suddenly stopped in order to pick up a passenger who was waiting on the shoulder of the road and the car being driven by William Vercher, Jr., which was also traveling in a southerly direction on said highway, overtook and struck the rear of said bus causing the injuries to the petitioner, Beatrice Lacour; that the injuries suffered by petitioner, Beatrice Lacour, were caused by the joint negligence of the driver of the said bus and/or William Vercher, Jr. in the following respects:
“(a) That the said driver of the Continental Southern Trailways bus suddenly stopped his vehicle without giving any adequate warning of his intention so to do.
“(b) That the driver of said bus stopped his vehicle on the paved portion of the highway despite the fact that there was sufficient room on the shoulder of the highway at that point, or in the immediate area.
“(c) That the driver of said bus failed to maintain an adequate and proper lookout to his rear so as to ascertain whether or not said bus could be stopped in safety on the paved portion of the highway.
“(d) That the said William Vercher, Jr. failed to maintain a proper lookout.
“(e) That the said William Vercher, Jr. was operating his vehicle at a grossly excessive rate of speed.
“(f) That the said William Vercher, Jr. failed to maintain his vehicle under proper control.”
It is further alleged that the collision between the respective vehicles caused the plaintiff, Beatrice Lacour, to suffer a strain of the paravertebral muscle mass of the back with coccyodynia.
The defendants in answer denied liability. Each alleged that it was the negligence of the other that caused the collision. The defendant bus company denied that its operator was guilty of any negligence either as the proximate cause or as a contributor to the accident and that said accident was caused solely by the negligence of William *591 Vercher, Jr., the driver of the Ford car, who failed to maintain a proper lookout, was operating his vehicle at an excessive rate of speed and failed to maintain control of said vehicle. This defendant did, however, admit that the plaintiff, Beatrice Lacour, was slightly injured on the 24th day of November, 1957, as a result of the collision between the Ford automobile and the bus. Defendant William Vercher denied that Beatrice Lacour was injured in said accident and further alleged that the accident referred to in the petition was caused solely by the fault and negligence of the driver of the bus and was not due to any fault whatever on the part of William Vercher, Jr. In addition to alleging that the driver of the bus was negligent as set forth in paragraphs (a), (b), (c), of Article 7 of plaintiffs’ petition, this defendant further set forth that the bus driver was very familiar with the vicinity where the accident took place and he knew or should have known that the highway at the point of collision runs through several sugar cane plantations and that said highway was very muddy from recent rains having fallen thereon and that he further should have known that a great amount of dirt and mud was brought onto said highway from the fields on both sides thereof by the farm tractors and vehicles hauling loaded sugar cane carts at several points and places on said highway and that to have driven the bus at the speed at which it was being driven at the time of and immediately prior to the collision constituted gross negligence on the part of the bus driver. This defendant further set forth that the bus driver should have known that there was an oncoming vehicle approaching from the opposite direction and that said highway was only a two-lane highway, 18 feet in width, with dirt shoulders on both sides thereof and the stopping of the bus on the west lane of said two-lane paved highway created a hazard and/or trap as regards the automobile driven by William Vercher, Jr., which said bus driver knew was following said bus close behind and that under the circumstances it was gross negligence for the bus driver to stop to pick up the passenger. Defendant Vercher alleges that these acts on the part of the bus driver constituted the negligence which was the proximate cause of the accident.
The case went to trial in the District Court on the pleadings as outlined above and a judgment was rendered in favor of Beatrice Lacour in the sum of $3,000 and in favor of Nathaniel A. Lacour in the sum of $753.30. The judgment was against the defendants in solido. From this judgment all defendants have appealed.
The facts in the case show that on the 24th day of November, 1957, it had been raining practically all day and at 6:45 o’clock p. m. on said date it had ceased to rain but the roads were still damp and the shoulders were wet and muddy. The bus of the defendant, Continental Southern Lines, Inc., was being operated.on said date from Alexandria, Louisiana; to Baton Rouge, Louisiana, and when said bus, traveling in a southerly direction reached a point on Highway One between Morganza and New Roads at a point in the immediate vicinity of the village of Labarre, it became involved in an accident with a Ford car driven by William Vercher, Jr. The Ford car was proceeding in the same direction as the bus and the right front of the Ford came in contact with the left rear of said bus. Some time prior to the collision, the bus passed the Ford car and it is the testimony of the driver of the Ford that at the time he was operating the Ford at a speed of approximately 55 miles per hour. The bus driver in passing the Ford running at this speed necessarily was operating the bus at a speed of some 57 or 58 miles per hour and, of course, in doing so he was violating the speed regulation of this State. When the bus passed the Ford automobile, the rear wheels of the bus threw mud and water on the windshield of said Ford, causing the driver thereof to be unable to see clearly. He, however, did not stop the Ford and clean the windshield but slackened his speed and continued his way down the road at a rate of speed of between 35 and *592 40 miles per hour. He testified the bus, after it passed him, stopped suddenly in the road to pick up a passenger and he did not have time to avoid a collision. This witness did not know how far removed from the collision the bus passed the Ford car but he did testify that it was in the vicinity of the sawmill, which is shown to be four-tenths of a mile north of the point where the collision occurred. Certainly the bus did not pass the car between the sawmill and the point of collision for the witness Stevens, who was standing on the side of the road to flag the bus for his daughter to board it, said that he could see all the way from the point where he was standing to the sawmill and he recognized the bus at that point from its lights and he did not see it pass any other car prior to the time of the collision. The bus driver likewise testified that he didn’t remember passing but one car from Morganza to the point of the collision and he was sure that he didn’t pass this car between the sawmill and the time he stopped.
The District Judge gave his oral reasons for judgment at the conclusion of the trial and said reasons were transcribed and placed in the record. At page 422 of the transcript he stated:
“Also if Mr. Mancuso passed him on a road in this kind of condition, he was negligent per se in passing that car. He had to pass him between 55 and 60 miles an hour to get by him, and if the road was in the condition that I think that it was, the bus driver also was negligent just — even though it hasn’t been plead — he was negligent if he passed him. If this other man was proceeding at 50 to 55, and he passed him, he was negligent from the passing of this man in the condition of that road.”
Further the court stated (tr. 427):
“Understand this, I am not passing on whether the bus driver was negligent in his stopping on the highway. Under the road conditions and so on, he probably was not.”
The foregoing excerpts from the reasons for judgment show that the District Judge did not find the bus driver guilty of negligence in stopping the bus on the highway but did find the bus driver guilty of negligence in passing the Ford automobile at a fast rate of speed with a road in a muddy condition.
We are of the opinion that even though the bus did pass the Ford automobile at an excessive rate of speed which was in violation of the statutory law of this State that such act cannot create liability on the part of the defendant bus company for said act was a remote and not a proximate cause of said accident. At the time the bus passed the Ford at the sawmill, the vehicles were four-tenths of a mile, or 2112 feet, north of the point of collision, and the bus continued to travel at a rate of speed of at least 55 miles per hour while the driver of the Ford testified he slowed down to approximately 40 miles per hour and necessarily the bus at the time it stopped along the highway after traveling 2112 feet was a considerable distance removed from the following Ford car.
When the bus driver reached a point immediately north of where the collision took place, he was flagged by one Stevens who was standing on the side of the road with his daughter. Both of them testified the bus came to a gradual stop and went by them for some 50 feet where it parked its two right wheels on the shoulder of the road and the remainder of the bus in the right or west traffic lane of said road. Not only these witnesses but several witnesses who were called and who were passengers on the bus also said the bus came to a gradual stop. The bus driver testified that when he was flagged by Stevens he touched his brakes twice and an indicator on the dash of the bus flashed revealing that the rear stop lights were on and it was after doing this that he gradually brought the bus to a stop with the right wheels on the shoulder of the road some 18 inches or 2 feet and the remainder of the bus in the west traffic lane about 3 feet removed from the center of the road. *593 The evidence showed the road is 18 feet in width. The bus driver explained he did not attempt to pull off the road any farther for the reason that there was an incline and the shoulder being muddy from the recent rain, it was not safe for him to stop the bus any farther on said shoulder.
It was after the bus had been stopped for approximately five seconds, according to the testimony of many witnesses, that the Ford automobile driven by young Vercher ran into it from the rear. In explanation of why the Ford car he was driving hit the bus, William Vercher, Jr., testified as follows:
“A. And he stopped to pick up passengers or something — at least the bus driver told me he stopped to pick up passengers. Actually, I didn’t see the passengers, myself, but when the bus passed, it dirtied my windshield up, and I couldn’t see clearly. But when it did pass me, it stopped. As scon as it passed me, it stopped and that’s when it happened. I started to go around the bus, but I couldn’t see too clearly, and I could see a light coming. I couldn’t tell how close it was, and I — well, it all happened so sudden. I mean, I started to go around Mm, and before I could really, say, go around the bus, I had hit him. Really, I didn’t have all that time, because the bus was — had stopped as soon as it passed me.” (our italics)
Thus, it was admitted by this witness that his windshield was dirty and that he could not see clearly but he did say he saw a light coming by which he meant the light of another car coming from the south and, of course, traveling north. It is true that he did state he couldn’t tell how close this car was but he never did state that this prevented him from going around the bus and passing it on its eastern side. As a matter of fact, his next utterance, as shown by the italicized portion of the above-quoted statement, establishes the fact that he did start to go around the bus but before he could do so he had hit it. There is evidence in the record that a car was proceeding from the south toward the north, or the opposite direction from which the bus and the Ford car were traveling. The bus driver states he saw the reflection of the lights of this car when he stopped and he estimated the lights to be from between a half and three-quarters of a mile in a curve to the south. The witness Stevens further testified that this car came up a little while after the accident and even though the car was proceeding toward the respective vehicles, it was not nearly close enough to the collision to have prevented young Vercher from driving the Ford in the east traffic lane around the bus.
The testimony of Trooper Walker, who investigated this accident some 25 minutes after it happened, was to the effect he found skid marks from the Ford car 65 feet north of the point of collision. He further testified he found no skid marks from the bus. Thus, if the driver of the Ford car did not apply the brakes until he was within 65 feet of a stopped bus and driving at a rate of speed of 40 miles per hour, then he could not have been more than 110 feet from this bus when he saw it. Consequently, he was guilty of negligence that was the proximate cause of this accident in failing to keep a proper lookout. It is understandable that he could not see the bus sooner, even though all of its lights were on because, according to his own testimony, he could not see clearly due to the dirty windshield. It was his duty under the circumstances to have cleaned the windshield so he could have seen. It is true that this witness testified that immediately after the bus passed him it stopped suddenly on the highway in front of him but it has heretofore been pointed out that due to the distance the respective cars traveled and the speed of each the bus did not stop immediately after passing the Ford car and, furthermore, it did not make a sudden stop because many witnesses testified as to the gradual stop of the bus and certainly if it had made a sudden stop it would have left skid marks on the road which would have been seen by the trooper.
*594 The plaintiffs and counsel for Vercher contend that the manner in which the bus stopped in the highway failed to leave an unobstructed width of said highway of not less than 15 feet upon the main traveled portion of the highway opposite said bus for the free passage of other vehicles arid that in doing so the bus driver violated the provisions of the Revised Statutes of 1950, Title 32, Section 241, subd. A. The evidence does show that the bus was stopped with its left wheels about 3 feet from the center line, according to the testimony of Trooper Walker, so consequently there was less than 15 feet of the main traveled portion of the highway opposite the bus left free for the passage of other vehicles, as the evidence shows the paved portion of the highway was only 18 feet in width.
The language of the statute does not prohibit stopping of a vehicle in the manner above outlined but prohibits the parking of a vehicle in such manner. In the case of McGehee v. Stevens, 15 So.2d 897, the term “park” as used in this statute was interpreted by the Second Circuit Court of Appeal as not comprehending or including a merely temporary or momentary stoppage but rather connotes a stoppage with the intent of permitting the vehicle to remain standing for an appreciable length of time. The court further said, on page 899, “neither does the word ‘parid in common usage embrace the temporary cessation of motion for the accomplishment of a particular lawful purpose, such as the discharging or receiving of passengers.”
We, therefore, are of the opinion that the driver, in stopping the defendant’s bus momentarily for the purpose of receiving the passenger, did not violate the provisions of the statute, even though he did not leave 15 feet clearance on the highway opposite from where he had stopped the bus. Further than this, the manner in which the bus was stopped did not constitute a proximate cause of this accident for the reasons heretofore given and, consequently, no liability attaches to defendant bus company even though the stopping of bus was in violation of the statute — Ardoin v. Williams, La.App., 108 So.2d 817.
Plaintiffs and defendant Vercher have cited several cases which they contend support the proposition that the bus driver, under the circumstances, was guilty of negligence constituting the proximate cause of this accident. These cases are Hill v. Knight, La.App., 163 So. 727; Peranio v. Superior Insurance Company, La.App., 76 So.2d 315; and Reeves v. Caillouet, La.App., 46 So.2d 373. The facts in these cases are very different from the facts in the present case. In the Hill case, where the plaintiff was allowed to recover, he was following a truck which stopped abruptly without signal or warning. The plaintiff attempted to cut to the left and pass the truck, but was prohibited from doing so by oncoming traffic. Further, in the Hill case, the court found there was no evidence of failure on the part of the plaintiff to keep a proper lookout, or to stop as promptly as possible when the emergency arose. In the Peranio case, the plaintiff stopped suddenly in front of the defendant who was in the following car and the Court held that he had thereby created a sudden emergency and refused to permit him to recover. In the Reeves case, the facts show that the defendant’s truck passed the plaintiff’s car within seven or eight hundred feet of the point of collision and that the defendant stopped the truck suddenly on the pavement. The plaintiff attempted to pass to the left of the truck but was prevented from doing so because another vehicle was coming from the opposite direction and it was necessary for him to cut back to the right and when he did so he struck the rear portion of the truck. The court noted that the stopping of defendant’s truck in such a short distance after passing plaintiff’s car constituted a stopping of the truck immediately and that the plaintiff had the right to suppose that the truck would not stop within such a short distance after said passing. Further, the court found the sudden stopping of the truck created an emergency.
*595 The defendant Vercher cites the case of Jack Cole Co. v. Hoff, Ky., 274 S.W.2d 658, as authority for the proposition that the violation of a statute relative to stopping a motor vehicle on a public highway constitutes such negligence as to make the violator responsible therefor. In view of our interpretation heretofore given of Title 32, Section 241, subd. A, of the Louisiana Revised Statutes of 1950, the normal stopping of a bus on the highway for the purpose of receiving or discharging of passengers does not constitute a violation of the statute.
Of course, it is the general rule of law that drivers of automobiles must use reasonable care in the operation thereof, such care as a prudent person would exercise under the same circumstances and this rule, of course, applies to cars traveling in the same direction. Louisiana Revised Statutes of 1950, Title 32, Section 234, provides as follows:
“A. The driver of a motor vehicle shall not follow another vehicle more closer than, is reasonable and prudent, having due regard to the speed of such vehicle and the traffic upon and condition of the highway.”
However, a person who is confronted with a sudden emergency not of his own making is not held to the exercise of the same degree of care as when he has time for reflection so it is on the theory of the lead car creating a sudden emergency that the courts permit the occupant of the following car to recover. From our appreciation of the testimony in this case, no sudden emergency was created by the driver of the defendant company’s bus but a sudden emergency was created by the operator of the Ford car which was following which consisted of failure to keep a proper lookout and keep said Ford car under control. Thus, if there is recovery in this case by the plaintiffs, it must be against the defendant, William Vercher.
The record reflects that Beatrice Lacour was sitting on the left side of the bus two seats from the rear thereof and it was immediately beneath where she was sitting that the Ford car ran into the bus. She testified she was knocked up into the air from the jolt and even though she did not feel any pain immediately thereafter her back began to hurt in a couple of hours and she filled out a card given to her by the bus driver in which she stated she had a backache. She went on to Baton Rouge that night on a substitute bus, planning to resume her duties as a domestic servant for a family in Baton Rouge. She was unable to go to work the next morning due to pain in her back and went to see Dr. Thomas Campanella, orthopedist, who testified she complained of back pain and told him about being in a bus-automobile accident. The doctor examined her and his testimony reflects that he found tenderness over the sacrum with tenderness and tightness of the paraverte-bral muscle mass and limitation of motion of the back. He saw her a week thereafter and she had not improved and he placed her in the hospital where she remained for a period of about 12 days where she was placed in traction for the whole of said time. He testified he placed her in the hospital because she was having pain in her left leg and was not improving and had considerable limitation of motion of the back, with a great deal of muscle spasm and considerable restriction or pain in the back, particularly in bending backward or from side to side. Subsequent to her discharge from the hospital, or about a week thereafter, he saw her again, at which time she showed some improvement. He saw her again about ten days later at which time she still had pain in the lower back and another pain where the abductor muscles attach. He saw her many times up until April of 1958, at which time he put an anesthetic agent over the painful area of the coccyx. He saw her twice more in May and December of 1958. She was still complaining of pain and he found that she had spasms of the muscles in her back. There were other visits by plaintiff to the doctor between December and August of 1959, at which time he started sonolator treatments. He gave *596 these treatments four times during the month of August, the last one being on August 14, 1959. Her last visit to this doctor was August 28, 1959, and it was his opinion at that time that she was suffering from a permanent 15% disability of the use of her back which would be intermittent.
There can be no question but what this plaintiff suffered a rather severe back injury and it was the finding of the District Court that it was brought about as a result of the jolt she received while sitting in the bus at the time the Ford car driven by William Vercher, Jr. ran into the rear of said bus. The District Judge pointed out he did not believe the testimony of some of the witnesses who said there was no jar or jolt at the time the collision took place and he gave as his reason the fact the Ford car ran into the rear of the bus with such force that it was badly damaged. We are of the opinion the District Judge was correct for it does not require a severe jolt to bring about the condition from which the plaintiff suffered.
There was an allowance of the sum of $3,000 as damages to this plaintiff for her personal injuries. Her testimony shows she suffered severely for a period of approximately two years. We have heretofore noted the extent of her treatment by Dr. Campanella. In addition thereto, Dr. Charles B. Cracraft, an orthopedist called by the defendant bus company, testified in this case to the effect that the plaintiff had a possible lumbo-sacral strain which was healed.
Since the defendant, Continental Southern Lines, Inc., has been relieved of liability herein, the ability of the remaining defendant to respond in damages must be considered by the court in making an award. The evidence shows the defendant Vercher to be a colored farmer who owns 157 acres of land, 32 acres of which are open land and subject to cultivation and the remainder thereof is low woodland subject to overflow. In addition, the whole of said property is mortgaged. When defendant Ver-cher was questioned about his average income per year, he testified that he had no average income. He does not own an automobile and has three children who are dependent upon him for support, (tr. 405-406-407) Under all these circumstances, we believe this defendant to be in impecunious circumstances and consider an award of $1,500 to be fair and equitable.
The District Court allowed the plaintiff, Nathaniel A. Lacour, the sum of $753.30 for the expenditures that he had made for the doctors, hospital bills and medicine in the treatment of his wife. The District Judge did not mention these bills in his oral reasons for judgment and in an examination of the record we find that Nathaniel A. Lacour paid the sum of $738.96, made up of the following items:
Hospital $195.30
Dr. Campanella 458.00
Dr. Planche 50.00
Medicine 16.33
Brace 19.33
Accordingly, the judgment is amended to award this plaintiff the sum of $738.96. We further note that the Judge granted an expert fee of $150 for Dr. Campanella and a fee of $200 to Dr. Charles Cracraft as expert witnesses in the case. These gentlemen are orthopedic surgeons and both of them live in Baton Rouge. The record reveals that they gave about the same amount of testimony, with possibly Dr. Campanella testifying a longer length of time. Under these circumstances, we feel they should receive an equal amount for their expert testimony. Accordingly, the judgment will be amended by reducing the fee of Dr. Cracraft from $200 to $150.
Accordingly, the judgment of the District Court granting plaintiffs’ demands against the Continental Southern Lines, Inc. is reversed. The judgment of the District Court is amended by reducing the award in favor of Beatrice Lacour to $1,500 and as amended it is affirmed against William Vercher individually and as administrator *597 of the estate of his minor child, William Vercher, Jr. The judgment is further amended by reducing the award to plaintiff, Nathaniel Lacour, to the sum of $738.96 and by reducing the fee of Dr. Cracraft in the amount of $50.
Reversed in part, amended, and as amended affirmed. Costs to be paid by defendant V ercher.